13.42.69 John F. Smith v. Norm Robinson Oral Argument Not to Exceed 15 Minutes Per Side Mr. Prescott for the Petition of the Public Thank you. May it please the Court, I'm Cheryl Taraska from the Ohio Public Defender's Office. On behalf of Mr. Smith, I'm reserving three minutes. Alright. At Mr. Smith's trial, defense counsel's theory of defense was that the victim's death was caused by his diabetes and complications from his diabetes. But counsel presented no evidence and no witnesses to support that theory of defense or to rebut the State's theory, which was that the assault by Mr. Smith caused the victim to become disinterested in his diabetes and neglect his diabetes and subsequently caused his death. In post-conviction, Mr. Smith presented the evidence and the testimony that would have proven his theory of defense at trial. And he submitted to the post-conviction court, to the trial court, that no reasonable attorney would have failed to present this evidence. Well, let me just interrupt there because in trying to see how to think about this case, I mentally took that collateral proceeding testimony and inserted it in the trial just to see how that would play out. And it seemed to me that there's some flaws in it. I mean, she kind of said, well, if that was true, he wouldn't have lasted four days. He would have only lasted two days. And that seems to me to be rank speculation. I disagree for a few reasons, Your Honor, and I'll address that. The State's expert at trial, Dr. Cox, was a neuropathologist. He seemed to know very little about the diabetic condition because the only testimony he gave about diabetes was, from what I understand, the victim needed insulin. It's incredibly important that you stay on top of that. And Dr. Cox drew this very specific causal connection between him having a head injury and somehow he mistreated his diabetes without specifics. What the post-conviction evidentiary hearing and what the affidavit and report from the endocrinologist established were some critical things that would have rebutted the State's theory that defense counsel could have used to cross-examine Dr. Cox, particularly that the victim was using non-prescription insulin to treat type 1 diabetes, which is completely inappropriate. And there are a couple points that Dr. Cox made on the record of the trial that were not explained. And there was no basis for the numbers that were given. Dr. Cox admitted at the time of the assault, yes, the blood sugar level was high, but nobody explained what that meant. And defense counsel did not investigate what it means to have numbers and levels to that extreme. And had the endocrinologist, like you said, had that been inserted as rebuttal in the defense's case in chief, that would have been critical to explain what actually happened to the victim. Because Dr. Cox, one of the statements that he made, he said, I considered changing the death certificate from it being a homicide to it being a natural death. But I didn't do that because that really wouldn't reflect what happened here. And what happened here was a change in behavior. And so none of the experts in the case, neither Dr. Cox nor Dr. Christofides in post-conviction, obviously none of them knew or examined the decedent. But Dr. Cox at trial testified about behavior that was changed by an assault, what he determined to be a behavioral change, when in reality this man's diabetes was out of control at the time of the assault. And there's a couple other critical pieces from the trial that go to this point. You're saying defense counsel didn't bring that out? Yes. That at the time of the assault it was a way out of control? Defense counsel tried to make the argument but had no evidence to explain what that meant. Defense counsel did not investigate what it means to have this level of out-of-control blood sugar. At post-conviction, our endocrinologist said when normal is between 80 and 110, when you're at 200, your cognition is affected. You're extremely fatigued. You aren't able to function. And at the time of the assault, the victim had a 465 level. So his behavior and his cognition and his problems were exacerbated from his own mistreatment before the assault even happened. But none of that information was able to be explained at the trial because counsel did not investigate or consult with an endocrinologist or look into what the diabetic situation was. And that's critical because Dr. Cox made such a tenuous connection. And the amount of insulin that the victim was taking and the blood levels that he exhibited and the endocrinologist was able to review, again, none of that was at trial. And the state court just ignored that when it considered the post-conviction claim. Regarding the timeline, to get back to Judge Guy's question about her speculation about the timeline, although, of course, she didn't examine the victim just like the state's experts didn't examine the victim, what was critical about her explanation was that she, as one of the top endocrinologists in the country, she was able to say if he was confused and did what we call stacking regular insulin, which is the overdose, which is what happened to this man, if that would have been a result of a head injury and symptoms from disorientation from the head injury, he would have been down within 24 to 48 hours. That's the problem because she has to assume that he would have started stacking the moment he got up from the floor from that hit on the head on the thing. She doesn't have any idea when he did that. Also, he had been self-medicating for a long time, and he still was alive until the blow on the head. Well, and that's another critical point that Dr. Christofides was able to testify about at post-conviction. She testified about how, and again, the state argues that it's speculation, but there is a documented honeymoon period for diabetics, and it usually is between six months and a year. And she testified that at that year mark, if you're not properly treating yourself, you begin to decompensate very quickly right after that year mark. Well, how long had it been? Exactly a year from the time that he was found in a coma. It was exactly a year. And so although none of the experts had examined this man, that is something that would have been critical to rebut the state's evidence. Basically, you're saying it's no more speculative than Cox's testimony. Nobody knew what he was really doing. It's far less speculative, Your Honor, than Cox's testimony because she was able to talk about the metabolic condition and what happens when you mistreat your metabolic condition and the timeline. Another point from Cox's testimony that was critical was about the amount of blood in his head injury. The victim had a small brain bleed, so he had a small amount of blood. He was found at his autopsy the day after he passed away. He had 12 cc's of blood. And Dr. Cox himself said, you need between 50 and 70 cc's of blood to be symptomatic of this head injury, to actually indicate symptoms. So the fact that Dr. Christofides was able to say, he overdosed within a very short amount of time between those days 3 and 4, that's when that overdose happened. She could say for sure that's when that overdose happened, between days 3 and 4, but that's when his head injury would not have been symptomatic. Let me ask you this. At the time, defense counsel should have conducted the further investigation. What evidence, and he's taken into account that he's not a medical expert or a medical person, what evidence was available to defense counsel at that time that should have alerted him to the need that he needed to perform additional investigation medically and what he should have done in that regard? Your Honor, the first key should have been the 465 blood glucose level at the time when Mr. Visor was hit by Mr. Smith. Well, he's not a doctor, so how does he know what to do based upon that? I mean, maybe he had been told by a medical person that his client was experiencing some kind of medical crisis or could experience some medical difficulty. So what does the record show was communicated to the lawyer such that the lawyer would have known that he needed to perform the investigation? Your Honor, my point is that a reasonable attorney, when making this investigation, would have consulted with an endocrinologist about what does this mean, what does this number mean, how high is it? And you're talking, I mean, I'm assuming that the lawyer is a layperson in terms of treatment of diabetics. What was it that should have alerted the lawyer that he needed to do that such that he wouldn't be guilty of ineffective assistance of counsel? Your Honor, when you're in a situation like this where there is a medical cause of death that's not the actual injury from the client, it is incumbent and it is a duty of defense counsel to investigate the cause of that death and what that means. And there was no investigation here. So there should have been a consultation. Can you refresh me as to whether there was an autopsy, is that right? Yes, Your Honor. And was there something in the autopsy that should have shown the lawyer that he needed to perform this investigation? Yes, Your Honor, the fact that the man died from a necrotic bowel, which was caused by his blood chemistry being so out of whack from his mistreated diabetes, that was the cause of death. His head injury was not serious enough to be fatal. Now, I do want to make the point that this is a little bit complicated because at trial, Dr. Cox said the first physician who did this autopsy ruled the cause of death as being the head injury, but that is false and that's not true. And this is the state's witness who said this. He said, I changed the cause of death from a head injury to diabetic ketoacidosis and changed it to be, so at the time that counsel was preparing for trial, it was established that the man had died from complications from his diabetes. He had already changed it? Oh, yes, Your Honor, yes. And so that was not a surprise that this is how this person died. How? I just have a... Sure. All right. I'll remember it by the time you come up again. Okay. Thank you. Thank you. May it please the Court, Your Honors, Ms. Traska, good morning, excuse me. My name is Mark Davis and I represent the respondent, I believe, Warden Charlotte Jenkins, formerly Norm Robinson, in this particular case. Now the issue before the Court is whether the Ohio Court's decision denying Smith's habeas claim based on the ineffective assistance of trial counsel was contrary to or involved in unreasonable application of federal law as established by Supreme Court precedent. Do we apply that standard even though the last court decided it on procedural grounds? Yes, Your Honor, we do. The petitioner cited Maples and Wiggins. However, what Maples and Wiggins say is that we don't apply the AEDPA when the state courts do not address the merits at all. Here, the state trial court in the post-conviction, the initial proceeding, they did address the merits of the claim, both the performance of trial counsel as well as whether he received a fair trial and whether there was any prejudice in that case. Further, I would also note that in the objections to the Magistrate Abel's report and recommendation, petitioner never objected to the application of the AEDPA, which is what the magistrate did and the district court did the same thing in this particular case. So how does one... You have somebody that hits somebody. I mean, it happens all the time. It's an assault, etc. And somehow the guy dies, even after going to the hospital. So how does a lawyer defending this person not fully investigate the diabetes and not put on a strong defense that says that he died from this, not from the punch? This is so totally disconnected. No one could have anticipated that this man's diabetes was out of whack at the time that he was first punched, etc. How does competent counsel not do that? I think there are several points that you raised there, Your Honor. The first thing that I would note is that we don't really know what trial counsel did in this case. The only evidence, there were no case files offered at the April 9, 2009 hearing. The only evidence that we have were hearsay statements that were, I believe it was the affidavit filed by Ms. Traska, where she spoke to Mr. McLeese, who said that he didn't remember what was investigated and what wasn't. This is trial counsel? This is trial counsel. And also Mr. Silcott, he had two lawyers. Mr. Silcott said that he spoke with someone regarding the brain injury and that there is no evidence as to what he found as a result of that investigation. So perhaps what that expert told him might have also had an effect on what he chose to pursue in terms of his line of thinking. Second, I would note that there was an effective cross-examination of Dr. Cox at trial regarding a lot of the issues that the petitioner raises. So I think that counsel's performance in this instance, it would be fair to say that counsel made a wise strategic choice. Further, Dr. Christophides, who was the endocrinologist who testified at the evidentiary hearing, the trial court took issue with the fact that she may not have been qualified to speak as an expert regarding cause of death or the blunt force trauma. And those are really the issues here. Nobody is disputing that diabetic ketoacidosis was the cause of death. The question is what caused him to mismanage his diabetes in the instance. So wouldn't it be very relevant in that situation what he was doing before he was punched? Yes, Your Honor. It could be relevant to go into what he was doing before he was punched. However, there really is no evidence of what he was doing. As Judge Guy pointed out earlier, everything that Dr. Christophides testified to was speculation. But it's also speculation to say that the reason he didn't take it was because his frontal lobe was injured. I mean, we don't know. Nobody knows why he didn't take it. So it's all inference. It's all going to be circumstantial. So you could say, okay, if somebody was managing their diabetes perfectly until they got punched and then all of a sudden they're over and under dosing, that's circumstantial evidence. But if somebody was all over the place before they got punched, that's different evidence. So wouldn't it be very important to have the other side of the story for the jury? I see what you're saying, Your Honor. However, I suppose my point is that there were no medical records to support what he was doing prior to that. Now, the State did put on evidence. Beth Spangler, his cousin, testified that she had recently moved to the area within a period of weeks and that he was functioning as a relatively healthy individual. Charlene Beiser testified that he used testing kits to manage his diabetes. But there are no medical records that an endocrinologist or any other doctor, for that matter, a neuropathologist or anyone, could have used to say conclusively what he was doing prior to that. However, after, we do have some information and evidence in the record that could be used. The CAT scan that Dr. Rausch, the radiologist, testified to at trial, he said that he had never seen anyone with that type of brain injury who was able to function. And I did hear what the petitioner stated regarding Dr. Cox's decision to change the death certificate. However, Dr. Cox did not just say that it was diabetic ketoacidosis. Dr. Cox said that he changed the death certificate from homicide due to blunt force cranioscerebral injuries to diabetic ketoacidosis based on an inability to manage it. These were two different witnesses. One said he never saw anybody function with that type of an injury. And someone else said that there were 12 cc's of blood and then normally to be symptomatic you need 50 to 70 cc's? Or were these two different brain injuries? We're talking about the same brain injury here. There were two different witnesses. The radiologist, Dr. Rausch, did testify, I believe, to blood volume in the head. I heard that petitioner mention that Dr. Cox spoke to that as well. And that may be the case, but I do know that Dr. Rausch testified to that, absolutely. And Dr. Cox also offered testimony regarding both the head injury and the effect that the diabetes may have had on him. Is Rausch the one that said, I've never seen anybody function with this type of injury? That was Dr. Rausch's testimony. And he was cross-examined on that point by council, which was the strategic choice that council made here. Council was aware that it was possible that an endocrinologist may not be qualified to rebut the testimony of the state's experts. Here we had Dr. Trenton who performed the initial autopsy. Although he did not testify, as we stated earlier, he found that these injuries were part of the cause of death. Then we had Dr. Rausch's testimony on top of Dr. Cox's testimony. Dr. Christophidis said in the evidentiary hearing herself that she was not qualified to talk about the effect of the blunt force trauma, nor was she qualified to speak to cause of death. In the Ricci case that I believe petitioner cites in support of the idea that council was ineffective in this case, in that case the court did determine that the failure to contact an expert precluded effective cross-examination. But here, as the magistrate noted on page one of the rule and recommendation, that's not what we have. The cross-examination here was very effective. As a matter of fact, he was able to get Dr. Cox to admit to several things. He got Dr. Cox to talk about the fact that it's highly irregular to have a blood glucose level of 1169, or 465 for that matter. Dr. Cox testified that the glucose level of 465 that he initially came in with, although it wouldn't necessarily give rise to death, it certainly would need medical attention. He further testified that absent the disease, the metabolic disease and the diabetes, the brain injury itself wouldn't be enough to kill him. And then, in closing argument, the trial counsel for the petitioner hammered a lot of these issues in closing. He did mention that normal blood sugar or glucose level would be between 80 and 110. So the issue here was whether the blunt force trauma could be considered approximate cause of the death and ultimately led to Mr. Biser's demise. And here the jury found that that's exactly what happened. So counsel's performance in this matter really was not deficient. I have another question. Certainly. All of this discussion thus far appropriately implicates the manslaughter charge, but what about the felonious assault charge? That could hardly have been disputed. I don't understand exactly what your question is. Well, he was indicted, wasn't he, for felonious assault and manslaughter or negligent homicide? Yes, Your Honor. Yes, Your Honor. So what happened in the course of trial with the felonious assault charge? He was convicted on both charges and they were merged for the purpose of sentencing. I believe he got eight years on both charges. The reason I ask that question is because in the nature of things, I'm sure not to him, but the sentence seemed relatively light. I guess I'm asking would felonious assault have justified eight years in and of itself if he had been found innocent of manslaughter? What's the statutory max? I do not know what the statutory maximum is for felonious assault. I don't know whether it's eight years or ten years. I'm actually not sure, Your Honor. I can't speak to what the statutory max is off the top of my head. We use a series of guidelines and look at that chart, and I don't recall exactly what the chart says regarding that particular level of felony. However, that was not raised at any level of these proceedings. That was not argued as a substantial factor in this particular case. But that would be the result of their winning. I understand that it might affect the ultimate sentence in this matter, but I suppose what I'm saying is that ultimately that wasn't the challenge. The challenge in this case is whether counsel's investigation was deficient and whether that ultimately caused the prejudice in this case. Right, but a remedy, what I'm saying is that it would be up to the state to choose the remedy, but one remedy that would be constitutional if we were to find a violation would be simply to enter a judgment of conviction for felonious assault because counsel was not ineffective as to that count. Certainly, Your Honor. Absolutely. I mean, I suppose that is what I… I was just asking the practical question because whenever you get into sentencing issues, this isn't really a sentencing issue, but you have to ask yourself, if this goes back, what difference does it make, and is the defendant arguably exposing himself to some greater liability if it goes back? Yeah, I suppose that the answer to that question is that it really would not make a difference. It seems like the sentence in this case was relatively light and… But the statute… I mean, in Michigan, felonious assault, straight felonious assault is a four-year max felony. I don't know what it is in your state, but there could be a difference in… There could be, Your Honor, as to the remedy. However, as I said, I did not look at the guidelines directly before I came in here. I was looking directly at the claim. However, I do recognize that there is a strong possibility, Judge Guy, that you're absolutely right on that. I believe we've addressed the prejudice. We've addressed the deficient performance of trial counsel, and so if there are no further questions from the panel, the respondent aptly respectfully requests that you affirm the district court's decision. All right. Thank you. Any rebuttal? Briefly, I would like to make a couple points about Dr. Rauch's testimony. He was the doctor who testified first about the head injury, and of course he did say that he wouldn't imagine someone with a head injury could function. He also testified that with the kind of head injury that Mr. Biser had, it would have a wide variety of symptoms from no symptoms to hardly able to function. Like there was a spectrum that he gave, and he couldn't say what Mr. Biser was on, what part of the spectrum Mr. Biser would have been. Well, how can he say both that he hasn't seen anybody function with this type of injury and with this type of injury you see people functioning? He said both, Your Honor. He did. That was part of his testimony. He said both things. But that's separate from what Dr. Cox talked about regarding the symptomatic nature of how much blood is in the brain. Regarding the effectiveness of counsel's cross-examination, he did question Dr. Cox, and he questioned him about all of these issues, but he didn't have the information that would have explained what these levels meant. And what would have been available had he investigated was a months-long look back at Mr. Biser's A1C level, is what Dr. Christovides described. From the medical records that she was able to review, she could look at how in control or out of control the man's diabetes was. What was the A1C level? It was 9.7, which she described how extremely out of control that is. I think the most important point really is the state's theory that Mr. Biser was healthy in all other respects. That's what they kept saying. He's healthy in all other respects. Hypothetical question to the expert witness. Assume this man is healthy in all other respects. What does it mean to you that he dies of diabetes? Well, it means that the head injury interfered with his ability to treat himself. In post-conviction, we had evidence that he had been using the wrong kind of insulin. His cousin could testify, sure, he had insulin, but it was not prescription insulin. Didn't that come before the jury, that it was the wrong kind of insulin? No, Your Honor. Nothing was talked about except nothing. So the only thing that was before the jury was he had this 465 level, but there was no explanation of what that meant. So the amount, and also briefly about the medical records that were before the jury, Mr. Biser was found with a blood glucose level of 28 at the time that he was found in a coma. He had 28. Dr. Christofides explained in post-conviction, there's no other way to have that except for to overdose on insulin in the recent past. You overdose, you have that 28. When the EMS came, they gave him glycogen to increase it, and when he showed up at the hospital, that glycogen and his completely out of control metabolic state took that 28 to like 1,000 something. And Dr. Cox at trial was like, yeah, when he was found, when he was taken to the hospital, his blood sugar was way high, so he was neglecting himself. But what Dr. Christofides could say is he stacked non-prescription insulin. Okay, excuse me. Didn't it come in that he had a 28 when EMS got there? That was in the record, but there was no discussion of it, and nobody explained what that meant. There was no investigation by defense counsel as to what that meant. So that's what was critical that prejudiced Mr. Smith, is that that was not able to be discussed at trial and did not come before the jury. Okay, but actually what it meant is that he hadn't taken it. No, it meant that he had taken too much. Oh, he had taken too much, right. That he had overdosed on regular non-prescription insulin, and that was not before the jury. If one came in the middle of what we heard today, it would sound like this was a direct appeal, and of course it isn't, and so we can't overlook the fact that we're reviewing, we're not taking a look at this if we would have decided it differently, but we have to review the state court's handling of it. I understand that, Your Honor, but because the state court didn't apply Strickland, the state court's decision does not have a Strickland analysis. The state court didn't say, was counsel Well, they found there was no ineffective assistance of counsel, and there's case law, strange as it may be, that if you opine on the ultimate issue, you don't have to say how you got there. I disagree with it. I mean, I think that what you're discussing is the Harrington case about how if you come to a conclusion without having a reason on the record, then you assume that it was overruled on its merits, but here, and the Ridley case from the 7th District is really on point about this, and that's cited in the brief. If the court below didn't apply, they gave an opinion. They said that it was an alternate theory of defense, which is absolutely untrue, and so as the 7th District said in Ridley, you can't ignore the reasoning that the state court gave because it came to the conclusion that it came to, and the reasoning the state court gave was not a Strickland analysis of Mr. Smith's claim. It was a finding of an alternate theory of defense, which was completely unsupported by the record, so this court would consider it de novo. Is that, in effect, the prejudice problem? You ask the same questions. I agree that on review you ask the same questions. I think that whether you go through the Ridley way of there was no finding of, there was no Strickland analysis, so it was a full de novo review, or whether you go through this is an unreasonable application of Strickland and an unreasonable determination of the facts based on Strickland, either way, this court should review it de novo. All right. Thank you very much, and the case shall be submitted.